IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

TYRONE HADLEY, an individual,

                Plaintiff,                    CV-09-022-ST

        v.                       REDACTED FINDINGS AND
                                           RECOMMENDATION

CITY OF BEAVERTON, a municipal
corporation, and
CHRISTOPHER FREEMAN,
an individual,

                   Defendants.

STEWART, Magistrate Judge:         **INTRODUCTION**

On January 18, 2008, defendant, Christopher Freeman ("Officer Freeman"), a Beaverton

police officer, removed plaintiff, Tyrone Hadley ("Hadley") from a Tri-Met MAX train stopped

at the Sunset Transit Center ("transit center") for allegedly interfering with public transportation

and interfering with a peace officer. The circumstances surrounding this incident form the basis

of this lawsuit which was originally filed in the Multnomah County Circuit Court for the State of

Oregon and later removed to this court on January 7, 2009.  Hadley filed his First Amended

Complaint ("FAC") on October 6, 2009, alleging in his First Claim pursuant to 42 USC § 1983

("§ 1983") that Officer Freeman violated his Fourth Amendment rights by unreasonably

detaining and arresting him, performing an unreasonable search, and using excessive force.  He

further alleges that he was deprived of his right to bodily integrity under the Fourteenth

Amendment and his constitutional right to travel.  His Second Claim alleges that Officer

Freeman and City of Beaverton (the "City") (collectively "defendants") are liable for the

common law torts of negligence (Count I), assault and battery (Count II), false arrest and

imprisonment (Count III), and negligent retention, supervision, and training (Count IV).

Defendants have moved for summary judgment on all of Hadley's claims (docket # 33).

This court has jurisdiction over the § 1983 claim pursuant to 28 USC § 1331 and supplemental

jurisdiction over the state law claims pursuant to 28 USC § 1367.  For the reasons discussed

below, defendants' motion should be GRANTED as to those portions of the § 1983 claim

conceded by Hadley, namely that he was deprived of his right to bodily integrity guaranteed by

the Fourteenth Amendment and the constitutional right to travel, all state law claims against

Officer Freeman, and the negligence (Count I of the Second Claim) and negligent retention,

supervision and training (Count IV of the Second Claim) claims against the City of Beaverton,

and otherwise DENIED.

## **STANDARDS**

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id*, at 324, *citing*

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir 1989), *cert*

*denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).  The substantive law

governing a claim or defense determines whether a fact is material.  *T.W. Elec. Serv., Inc. v. Pac.*

*Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The court must view the inferences

drawn from the facts "in the light most favorable to the nonmoving party."  *Id.* (citation omitted).

## FACTS

Because all material facts must be viewed in the light most favorable to the non-movant,

this court will view the evidence most favorably to Hadley.  A review of the parties' facts, as

well as the other materials submitted by the parties, including affidavits, declarations, and

deposition excerpts,[1] reveals the following facts.

**I.  Fare Inspection**

On the morning of January 16, 2008, on his commute to work, Hadley transferred at

Pioneer Square onto a westbound MAX train.  Hadley Depo., p. 87.[2]  Hadley sat at the front of

---

[1]  Both parties have submitted documents with various attachments.  Citations to affidavits and depositions are identified by the last name of the affiant or deponent, and citations are to the paragraph(s) of the affidavit or page(s) of the deposition transcript.

[2]  Both parties submitted portions of the Hadley deposition.  Devlin Aff., Ex. A; Furnanz Decl., Ex. A.

3 - FINDINGS AND RECOMMENDATION

the first car above the stairs near the window in the first row of double seats.  *Id* at 84; Furnanz

Decl., Ex. F.  Most of the other passengers were in seats behind him.  Hadley Depo., p. 86.  The

MAX train stopped at the Sunset Transit Center, and several Beaverton Police officers, including

Officer Freeman, boarded the train to conduct fare inspections.  Hadley was asleep when the

train stopped, but was awakened when he heard a dog barking.  *Id* at 87, 94-95.  Hadley noticed

approximately eight to ten officers boarding the train with a police dog and understood that they

were conducting a fare inspection.  *Id* at 87.

Hadley noticed Officer Freeman checking other passengers' fare receipts, beginning at

the back of the area at the top of the stairs.  *Id* at 89-90.  Officer Freeman was the only officer

performing a fare inspection in that area.  *Id* at 93.  Hadley noticed Officer Freeman looking

from side to side and presumed that he was checking fares on both sides of the car.  *Id* at 91-93.

Hadley thought that it was possible that the other passengers already had their fare receipts

displayed in their hands for Officer Freeman to inspect.  *Id* at 93.

Approximately ten seconds elapsed from the time Hadley noticed Officer Freeman

beginning to check fares to the time he reached the front of the train where Hadley was seated.

*Id* at 92.  Officer Freeman asked to see Hadley's fare, and Hadley responded that he forgot where

he put his fare receipt.[3]  *Id* at 95, 111-12.  Hadley was wearing a big "puffy" goose down jacket

that his wife had given to him for Christmas a couple of weeks earlier.  *Id* at 97.  The jacket went

down to Hadley's thigh area right above his knees and had 13 pockets, several of which had

zippers and flaps.  *Id* at 95-96, 104-05.

---

[3] According to Officer Freeman, Hadley said that he did not think he had his fare receipt.  Freeman Depo., p. 111.
However, at this juncture, the court must view the facts in the light most favorable to Hadley.

Hadley first searched his pants pockets.  *Id* at 97-98.  He then checked the mid-level

pockets in his jacket, but could not find his fare receipt.  *Id* at 98.  Next, he stood up and again

checked his pants pockets.  *Id*.  At that point, Hadley told Officer Freeman, "I know I have it

here somewhere.  Just – give me a second."  *Id*.  Officer Freeman then screamed in a loud,

intimidating, angry voice, "Get off the train."  *Id* at 98, 117.  Hadley responded by telling Officer

Freeman, "You don't have to yell at me . . . I have my ticket.  Just give me a minute.  Please let

me find it."  *Id* at 98.

Hadley then checked four lower level coat pockets, but did not find the fare receipt and

told Officer Freeman, "I don't have it in there.  I know I have it in here somewhere."  *Id* at 98-

99.  In a lower voice, Officer Freeman told Hadley to get off the train for a second time.  *Id* at

99, 119.  Hadley again told Officer Freeman that he had a fare receipt, but just did not remember

where he put it.  *Id* at 99.  At the same time, Hadley checked the mid-level pockets again, still

not finding the fare receipt.  *Id* at 99, 120.  Officer Freeman then told Hadley in a loud voice that

he was asking him "one more time" to get off the train.  *Id* at 99.  Hadley responded that "there

was no need" for him to get off the train because he paid his fare and just needed to find his

receipt.  *Id*.

As he reached for his upper left breast pocket, Officer Freeman grabbed Hadley's right

arm and bent it behind his back.  *Id* at 99, 123.  Hadley felt his right shoulder "pop" and then

Officer Freeman grabbed his thumb, squeezing and bending it.  *Id* at 99-100.  Officer Freeman

grabbed Hadley's left hand and put on handcuffs.  *Id* at 100.  Hadley told Officer Freeman that

he was being hurt and asked him to check his other pockets.  *Id* at 100, 125.  Officer Freeman

responded that it was too late for that.  *Id*.  He then forced Hadley off the train onto the platform

5 - FINDINGS AND RECOMMENDATION

by raising up the handcuffs to lean Hadley forward, which caused additional pain to Hadley's

right shoulder. *Id* at 126. Hadley estimates that Officer Freeman gave him "less than a minute"

to look for his fare receipt before handcuffing him. Hadley Decl., ¶ 3. Other passengers

witnessed Officer Freeman "yelling at [Hadley] and dragging him off the train." Schaer Depo.,

p. 5. Officer Freeman removed Hadley from the train based on his belief that he had probable

cause that Hadley had committed the crimes of interfering with public transportation,

ORS 166.116(1), and interfering with a peace officer, ORS 162.247(1). Freeman Depo., p. 111.[4]

Officers may provide warnings, issue citations, or place a person under arrest when they

encounter violations on Tri-Met MAX trains. Beane Depo., p. 33.[5] Officers also may ask

passengers to exit a MAX train when they are searching for a fare receipt so they do not unduly

delay the train. *Id* at 36.

## II.  Platform Search

Once on the platform, Officer Freeman had Hadley stand in front of a bench against a

wall and asked him to spread his legs. Hadley Depo., pp. 100, 127-28. When Hadley spread his

legs, Officer Freeman kicked his right leg to spread them further apart. *Id* at 128. Hadley told

Officer Freeman not to kick his legs because it hurt and he had "hardware in there." *Id* at 129.

Officer Freeman then patted down Hadley's front pockets, legs and back, and began taking items

out of his pockets, placing them on the bench. *Id* at 130, 134. Officer Freeman then asked

Hadley for identification, and Hadley responded that it was in his wallet which was probably in

---

[4]  Both parties submitted portions of the Freeman deposition. Devlin Aff., Ex. B; Furnanz Decl., Ex. B; Devlin Aff. in
Support of Surreply, Ex. J.

[5]  Both parties submitted portions of the Beane deposition. Devlin Aff., Ex. E; Furnanz Decl., Ex. D; Devlin Aff., in
Support of Surreply, Ex. L.

one of his jacket pockets. *Id* at 130-31, 136. Officer Freeman then searched Hadley's top jacket pockets and located the fare receipt in the upper left breast pocket. *Id* at 131. Hadley said, "there's the ticket right there." *Id* at 133-34. After Officer Freeman again asked for Hadley's identification, Hadley replied that it was probably in his inside pocket. *Id*. Officer Freeman then unzipped Hadley's coat and found a wallet in an inside pocket. *Id* at 134, 137.

After finding the wallet, Officer Freeman walked away, leaving Hadley handcuffed, and proceeded to look through Hadley's wallet until he moved out of Hadley's line of sight. *Id* at 137-39. After Officer Freeman walked away, his supervisor, Sergeant Steve Schaer ("Sgt. Schaer") approached Hadley and told him to turn around and sit down on the bench. *Id* at 138 - 141. Sgt. Schaer told Hadley that they could not hold up the train for one person to look for his fare receipt. *Id* at 141. While on the platform in handcuffs, Hadley was upset and making "sobbing-type noises." *Id* at 142; Schaer Depo., p. 23. Hadley observed at least one other officer on the platform and, with the exception of Officer Freeman, felt that he was treated with respect and spoken to in a nice, calm, consistent tone. Hadley Depo., pp. 139, 151.

Five to eight minutes later, Sgt. Schaer removed the handcuffs. *Id* at 140-42. Hadley estimates that he spent approximately ten minutes on the platform after he was removed from the train until his handcuffs were removed. *Id* at 151. Sgt. Schaer asked Hadley his name, address, and telephone number, which Hadley provided. *Id* at 142. After a brief moment, Sgt. Schaer thanked Hadley for being truthful, shook his hand, and told him he was "free to go." *Id*.

Hadley picked up his belongings from the bench, including his wallet which had been returned, and waited for a "few" minutes for the next train to arrive. *Id* at 143. He estimates that he waited for no more than five minutes, as the trains ran every 15-20 minutes. *Id*. Hadley

7 - FINDINGS AND RECOMMENDATION

estimates that it typically took approximately 20 minutes to travel from the transit station to his

destination at the 185th Avenue station with about four stops in between.  *Id* at 107-09.  Upon

arriving at work, Hadley decided to go to the hospital because of the pain in his shoulder.  *Id* at

144.

At the hospital, Hadley reported and was diagnosed with right shoulder pain.  Devlin

Decl. (docket # 61), Ex. M, pp., 2, 6-8.  An X-ray found no evidence of a fracture.  *Id* at 9.  He

was prescribed a sling and narcotic pain medications.  *Id* at 6-8.  He then left the necessary

paperwork with his supervisor at work, returned home, and went to bed.  Hadley Depo, pp. 144-

46.

At a follow-up evaluation on January 23, 2008, Hadley reported continuing shoulder

pain.  Devlin Decl. (docket # 61), Ex. M, pp.  31.  He was prescribed more narcotic pain

medications and given an MRI.  *Id*.  The MRI scan was normal.  *Id* at 25, 33.  At additional visits

in February and early March, he continued to report shoulder pain, was prescribed narcotic pain

medications and physical therapy, and also received a cortisone injection.  *Id* at 15, 22-27.  He

was released for regular work duties on March 6, 2008.  *Id* at 16.

<u>**FINDINGS**</u>

**I.  <u>§ 1983 Claim (First Claim for Relief)</u>**

The First Claim alleges that several of Hadley's constitutional rights were violated when

Officer Freeman removed him from the MAX train.  In particular, the First Claim alleges that

Hadley was deprived of his right to bodily integrity guaranteed by the Fourteenth Amendment

and the constitutional right to travel.  However, Hadley concedes the motion with regard to these

claims.  The First Claim also alleges that Hadley's Fourth Amendment rights were violated by

Officer Freeman's unreasonable detention and arrest, unreasonable search, and use of excessive force.  Defendants move for summary judgment against this claim, asserting that they committed no constitutional violations and that even if they did, Officer Freeman is entitled to qualified immunity.

### A.  Qualified Immunity

The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 US 800, 818 (1982).  Therefore, public officials are generally immune from civil liability unless their actions violate clearly established law because "a reasonably competent public official should know the law governing his conduct." *Id*.  "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 US 224, 229 (1991) (citation and internal quotations omitted).

The qualified immunity inquiry has traditionally involved two prongs.  First, the court must decide whether the plaintiff has shown that a constitutional or statutory right has been violated.  *Saucier v. Katz*, 533 US 194, 201 (2001).  If the first step is satisfied, the court must then decide whether the right at issue was "clearly established" at the time of the alleged violation.  *Id*.  However, the Supreme Court recently held that lower courts are no longer required to address the prongs in order and may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of

9 - FINDINGS AND RECOMMENDATION

the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S Ct 808, 818 (2009).

The inquiry "must be undertaken in the light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 US at 201. Officer Freeman can be held liable only for violation of a right the "contours [of which are] sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Id* at 202. Therefore, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. To be clearly established, the law need not be a "precise formulation of the standard" where "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Id*. The key inquiry in determining whether an officer has qualified immunity is whether the officer has "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 US 730, 739-40 (2002).

This court will first address whether a constitutional right has been violated before analyzing whether the right was clearly established.

### B.  Fourth Amendment

Defendants argue that Officer Freeman lawfully stopped Hadley based on a reasonable suspicion that Hadley had committed the offenses of interfering with public transportation and interfering with a peace officer. Even if the detention was an arrest, defendants alternatively argue that Officer Freeman had probable cause to arrest Hadley for those same crimes.

Defendants further contend that Officer Freeman's search of Hadley was reasonable and that

Officer Freeman did not use excessive force in removing Hadley from the MAX train.

The Fourth Amendment protects persons from "unreasonable searches and seizures." A

brief, consensual stop by police to question a citizen is not a seizure, so long as a reasonable

person would feel free to "disregard the police and go about his business." *Florida v. Bostick*,

501 US 429, 434 (1991) (citation omitted). However, two other types of non-consensual stops

by police are considered seizures under the Fourth Amendment.

First, police may seize a person for a brief investigatory stop when the officer has a

"reasonable suspicion" to believe that the individual has committed wrongdoing. *See Terry v.*

*Ohio*, 392 US 1, 23-27 (1968). This is commonly referred to as a "*Terry* stop." To justify such a

seizure, the officer must have "articulable suspicion that a person has committed or is about to

commit a crime." *Florida v. Royer*, 460 US 491, 498 (1983). However, this limited exception

requires justification both as to the scope and duration of the seizure:

> The predicate permitting seizures on suspicion short of probable
> cause is that law enforcement interests warrant a limited intrusion
> on the personal security of the suspect. The scope of the intrusion
> permitted will vary to some extent with the particular facts and
> circumstances of each case. This much; however, is clear: an
> investigative detention must be temporary and last no longer than
> is necessary to effectuate the purpose of the stop.

*Id* at 500 (citations omitted).

Second, a police officer may arrest an individual without a warrant when the officer has

probable cause to believe the individual has committed or is committing a crime. *Draper v.*

*United States*, 358 US 307, 313 (1959); *see also Allen v. City of Portland*, 73 F3d 232, 235 (9th

Cir 1996). An officer may make a warrantless arrest, even for very minor criminal offenses.

*Atwater v. City of Lago Vista*, 532 US 318, 354 (2001); *see also Tatum v. City and County of San Francisco*, 441 F3d 1090, 1094 (9th Cir 2006).

Probable cause exists when "'the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense.'" *Blankenhorn v. City of Orange*, 485 F3d 463, 471 (9th Cir 2007) (citation omitted). Oregon uses a similar standard. ORS 131.005(11) ("'Probable cause' means that there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it"). It requires only a "fair probability" or a "substantial chance" of criminal activity, not an actual showing that such activity occurred. *United States v. Brooks*, 367 F3d 1128, 1134 (9th Cir 2004) (citation omitted). In determining probable cause, the court must examine the totality of circumstances known to the officers at the time of their actions. *Devenpeck v. Alford*, 543 US 146, 152-53 (2004). An arresting officer's subjective reasons for making the arrest are irrelevant to the existence of probable cause. *Id*.

Although the existence of probable cause is a highly fact dependent issue, "whether a reasonable officer could have believed probable cause . . . existed to justify . . . an arrest is 'an essentially legal question' that should be determined by the district court at the earliest possible point in the litigation." *Peng v. Mei Chin Penghu*, 335 F3d 970, 979 (9th Cir 2003), *cert denied*, 540 US 1218 (2004), *quoting Act Up!/Portland v. Bagley*, 988 F2d 868, 873 (9th Cir 1993). "Thus, where the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts, it is appropriate for this court to

decide whether probable cause existed at the time [Officer Freeman] arrested [Hadley]."  *Id* at

979-80.

///

### 1.  Detention

#### a.  Violation of a Constitutional Right

The parties disagree whether Hadley was subjected to a *Terry* stop, requiring reasonable

suspicion, or placed under arrest, requiring probable cause.  There is "no bright-line rule for

determining when an investigatory stop crosses the line and becomes an arrest."  *United States v.*

*Parr*, 843 F2d 1228, 1231 (9th Cir 1988).  Instead, it requires a "fact-specific" inquiry.

*Washington v. Lambert*, 98 F3d 1181, 1185 (9th Cir 1996).  "A brief, although complete,

restriction of liberty, such as handcuffing during a *Terry* stop is not a de facto arrest, if not

excessive under the circumstances."  *Haynie v. County of Los Angeles*, 339 F3d 1071, 1077 (9th

Cir 2003) (citations omitted).  The Ninth Circuit has held that the court may consider whether an

average person, innocent of any crime, would reasonably believe that "after brief questioning, he

or she would not be free to leave."  *United States v. Pinion*, 800 F2d 976, 978-79 (9th Cir 1986),

*cert denied*, 480 US 936 (1987).  The relevant inquiry is one of reasonableness under the

circumstances.  *Allen v. City of Los Angeles*, 66 F3d 1052, 1057 (9th Cir 1995) (citations

omitted).

After Hadley refused to exit the MAX train, Officer Freeman handcuffed and forcibly

removed him from the train, causing pain in his right shoulder.  Hadley then was asked to face

the wall and spread his legs while Officer Freeman searched his pockets, removing various items

and placing them on the bench in front of Hadley.  During the search, Officer Freeman

ultimately discovered Hadley's fare receipt, as well as his wallet.  Instead of removing the

handcuffs at that time, Officer Freeman left Hadley facing the wall, with his legs spread.

Another officer allowed Hadley to sit down, but did not remove his handcuffs until several

minutes later.  By his own estimation, Hadley remained in handcuffs for approximately ten

minutes.  While the physical restraint of Hadley did not automatically convert the stop into an

arrest, viewing the facts in the light most favorable to Hadley, the court finds that Hadley would

not feel as though he was free to leave, thereby converting the *Terry* stop into an arrest.

The court must next determine whether Officer Freeman had probable cause to arrest

Hadley for a crime.  A person commits the crime of interfering with public transportation if the

person, among other acts, "(a) intentionally or knowingly enters or remains unlawfully in or on a

public transit vehicle or public transit station; (b) intentionally or knowingly interferes with the

provision or use of public transportation services by, among other things, interfering with the

movement of, or access to, public transit vehicles."  ORS 166.116(1).  The statute defines "enter

or remain unlawfully" as in ORS 164.205, namely "to fail to leave premises that are open to the

public after being lawfully directed to do so by the person in charge."  Similarly, a person

commits the crime of interfering with a peace officer if the person, "knowing that another person

is a peace officer . . . refuses to obey a lawful order by the peace officer."  ORS 162.247(1)(b).

Hadley contends that a jury could not find that he violated either statute because Officer

Freeman did not "lawfully direct" or give a "lawful order" to him to leave the MAX train.

Officer Freeman gave his first order to Hadley to get off the train immediately after asking to see

Hadley's fare receipt and Hadley responded that he had purchased a fare and was actively

looking for his fare receipt.  Less than a minute later, after Hadley failed to comply with his

second and third orders, Officer Freeman then forcibly removed Hadley from the train.  Hadley

further asserts that a reasonable jury could conclude that he did not violate ORS 166.116(1)(b)

by interfering with the movement of the train in the brief period of time that Officer Freeman

gave him to find his fare receipt.

  The difficulty at this juncture is trying to determine if the MAX train was delayed in any

way by Hadley's inability to find his fare receipt in less than a minute.  Defendants point to

Hadley's recollection that of the eight to ten officers he first saw boarding the train, he saw only

one officer in addition to Officer Freeman when being removed from the train.  Hadley Depo.,

pp. 87, 100.  Thus, defendants conclude that all the other officers had completed their fare

inspections and that Officer Freeman was either the last or the next to the last officer off the

train, leading to the reasonable inference that Hadley delayed the train's departure.  However, as

Hadley points out, a fare inspection itself  necessarily delays a train.  The officers must board,

inspect fares from all passengers, and then disembark before the train can depart.  There are no

written guidelines for removing passengers during an inspection, leaving it to the judgment of

the individual officer.  Beane Depo., pp. 33-35.  The record contains no evidence as to how long

the inspection took, how long the train was scheduled to be in the station, and how long it was

actually stopped in the station.  Furthermore, no law requires a passenger to have a fare receipt

out and ready for immediate inspection.

  At this juncture, this court cannot determine one way or the other whether Hadley

intentionally or knowingly delayed the departure of the train.  If he did, then Officer Freeman

gave a lawful order to leave the train and had probable cause to arrest Hadley for not doing so.

However, if he did not, then none of Officer Freeman's three orders to leave the train was a

lawful order and no probable cause existed to arrest Hadley.  This factual issue must be resolved by a jury before a constitutional violation can be established.

### b.  Clearly Established Law

The constitutional right is clearly established that an officer may arrest a person based on probable cause.  Although defendants argue that Officer Freeman's conduct did not violate any clearly established right, they do not explain why.  Instead, they argue only that Officer Freeman had probable cause to arrest Hadley.  Given the factual issue discussed above as to whether Officer Freeman had probable cause to order Hadley off the train, summary judgment should be denied on the unlawful seizure claim on the basis of qualified immunity.

### 2.  Search of Hadley's Person

### a.  Violation of a Constitutional Right

Hadley claims that the search of his person was unlawful because he did not consent to the continued search of his pockets after his fare receipt had been located.  "A police officer may, incident to a lawful arrest, conduct a contemporaneous warrantless search of the arrestee's person and of the area into which the arrestee might reach to retrieve a weapon or destroy evidence."  *United States v. Tarazon*, 989 F2d 1045, 1051 (9th Cir), *cert denied*, 510 US 853 (1993) (internal quotation omitted).

As discussed above, if Officer Freeman had probable cause to arrest Hadley for violating ORS 166.116 and/or ORS 162.247, then he was permitted to obtain information related to Hadley's identity and conduct a contemporaneous warrantless search of Hadley's person.  To the contrary, if the arrest was unlawful, then any subsequent search also was unlawful.  In other words, this claim rises or falls on the lawfulness of the arrest.  Due to the a factual dispute

concerning the existence of probable cause for the arrest, summary judgment is necessarily

precluded on this issue.

### b.  Clearly Established Law

The constitutional right to search incident to an arrest is clearly established.  Although

defendants argue that Officer Freeman's conduct did not violate any clearly established right,

they do not explain why but argue only that Officer Freeman had probable cause to arrest

Hadley.  If the arrest was lawful, then Officer Freemen is entitled to qualified immunity on this

issue.  However, given the factual issue concerning the lawfulness of the arrest, summary

judgment should be denied on the unlawful search claim on the basis of qualified immunity.

### 3.  Excessive Force

Without probable cause to arrest Hadley, Officer Freeman had no reason to attempt to

force Hadley to exit the MAX train and is not be entitled to qualified immunity with respect to

the claim for excessive force.  However, if the arrest was lawful, then Officer Freeman is entitled

to qualified immunity provided that the force used was reasonable and not excessive under the

circumstances.  Despite the factual issue concerning the lawfulness of the arrest, this court will

nonetheless address, for the benefit of future proceedings, the issue of qualified immunity on this

claim assuming that the arrest was lawful.

### a.  Violation of a Constitutional Right

An officer's use of force in any "seizure" of a person is analyzed under the Fourth

Amendment's "objective reasonableness" standard.  *Graham v. Connor*, 490 US 386, 388

(1989).  Whether an officer has used excessive force in effecting an arrest is determined by

assessing whether the force applied was objectively reasonable "in light of the facts and

circumstances confronting [the officers], without regard to their underlying intent or motivation." *Id* at 397. Determining the reasonableness of the force "requires a careful balancing of the nature and quality of the intrusion on an individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id* at 396 (internal quotation marks and citations omitted).

This analysis "requires balancing the 'nature and quality of the intrusion' on a person's liberty with the 'countervailing governmental interests at stake' to determine whether the force used was objectively reasonable under the circumstances." *Smith v. City of Hemet*, 394 F3d 689, 701 (9th Cir), *cert. denied*, 545 US 1128 (2005) (citations omitted). Thus, the court must "first assess the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors." *Deorle v. Rutherford*, 272 F3d 1272, 1279-80 (9th Cir 2001), *cert denied*, 536 US 958 (2002). Factors to consider in assessing the government interests at stake include: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 US at 396. The court may also consider "the availability of alternative methods of capturing or subduing a suspect." *Smith*, 394 F3d at 703. Another factor to be considered is "the giving of a warning or the failure to do so." *Deorle*, 272 F3d at 1284. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham*, 490 US at 396.

Police officers are not required to use the least intrusive degree of force possible, but are required only to act within a reasonable range of conduct. *See Scott v. Henrich*, 39 F3d 912, 915

(9th Cir 1994) (requiring officers to find and choose least intrusive alternative would require

them to exercise superhuman judgment), *cert. denied*, 515 US 1159 (1995); *Forrester v. City of*

*San Diego*, 25 F3d 804, 806-07 (9th Cir 1994) (use of minimal and controlled force in manner

designed to limit injuries reasonable), *cert. denied* 513 US 1152 (1995).  Since the use of even

reasonable force creates an inherent risk of injury, the mere fact that a plaintiff is injured does

not establish that the force used was excessive.  However, a plaintiff may prove excessive force

even where there is no significant injury.  *See Wilks v. Reyes*, 5 F3d 412, 416 n1 (9th Cir 1993)

(plaintiff entitled to award of nominal damages even if no actual damage suffered).

Excessive force claims generally present questions of fact for the jury to resolve.  *Hervey*

*v. Estes*, 65 F3d 784, 791 (9th Cir 1995).  However, the court may decide such claims as a matter

of law if, after resolving all factual disputes in favor of the plaintiff, the court concludes that the

officer's use of force was objectively reasonable under the circumstances.  *Scott*, 39 F3d at 915.

Given that the balancing usually involves disputed factual contentions, summary judgment in

excessive force cases "should be granted sparingly."  *Drummond v. City of Anaheim*, 343 F3d

1052, 1056 (9th Cir 2003), *cert denied*, 542 US 918 (2004).

For purposes of this analysis, the court must assume that Officer Freeman issued a lawful

order to Hadley to exit the train.  It is undisputed that Hadley refused to do so.  The issue is

whether the degree of force used by Officer Freeman in response to that refusal was objectively

reasonable under the circumstances.  Hadley maintains that Officer Freeman overstepped the

need for physical restraint by grabbing his right shoulder and bending it back, causing it to

"pop."  The resulting shoulder pain required medical treatment, including a sling, narcotic pain

medications, physical therapy, and a cortisone shot, although Hadley suffered no permanent injury.

In the reasonableness analysis under *Graham*, the "most important single element" is the threat posed by the plaintiff at the time of the incident.  *Smith,* 394 F3d at 702.  Here the record reveals no basis for Officer Freeman to believe that Hadley was armed or posed an immediate threat to anyone's safety.  The second *Graham* factor is the severity of the crime at issue.  The only crimes allegedly committed by Hadley were misdemeanors based on Hadley's refusal to produce a valid fare receipt and to obey repeated orders.  These offenses are not especially egregious and rate low on the severity scale.  The third *Graham* factor is whether Hadley was actively resisting arrest or attempting to evade arrest by flight.  Hadley did continue to ignore Officer Freeman's orders to exit the train, but did not attempt to run from Officer Freeman and did not physically resist his arrest.

Although all these elements favor Hadley, an additional factor in the *Graham* analysis is the availability of alternative methods of capturing or subduing a suspect.  Assuming Officer Freeman's order was lawful, then some use of force was necessary to compel Hadley to comply after he refused to voluntarily exit the MAX train.  Hadley has submitted no evidence that Officer Freeman's conduct violated applicable police standards or that alternative techniques were available for subduing him that presented a lesser threat of injury.  Officer Freeman used a control hold which is the least restrictive force available short of a verbal order which Hadley had already ignored three times.

Despite the injury to Hadley's shoulder, the record does not reflect that Officer Freeman applied any more force than was reasonably necessary to secure Hadley in handcuffs and remove

him from the train.  Use of pain is not constitutionally prohibited, but is limited by the Fourth

Amendment's reasonableness component.  Whether the force accomplishes its objective bears on

its reasonableness.  Because the ultimate purpose was to make Hadley exit the MAX train, the

force used, although it inflicted some pain requiring subsequent medical treatment, directly

accomplished that purpose.

     "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's

chambers violates the Fourth Amendment." *Graham*, 490 US at 396.  The reasonableness

analysis must make "allowance for the fact that police officers are forced to make split second

judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount

of force that is necessary  in a particular situation." *Id.*  In a similar case, *Arpin v. Santa Clara*

*Valley Tranp. Agency*, 261 F3d 912, 921-22 (9th Cir 2001), the Ninth Circuit found that twisting

the plaintiff's arm behind her with enough force to lift her off the ground and break her

watchband while attempting to handcuff her was a reasonable use of force, given that the

plaintiff refused to show transit identification and was warned that non-compliance would lead

to arrest.  *Also see Forrester*, 25 F3d at 807 (affirming a jury verdict that the officers did not use

excessive force when using pain compliance techniques, resulting in a tendon injury and broken

wrist, to arrest non-violent demonstrators).  The record reflects an almost identical situation to

that in *Arpin*, except that Hadley sustained a minor injury requiring follow-up medical care.  The

fact that Hadley suffered an injury does not turn what would otherwise be a permissible use of

force into constitutionally impermissible excessive force.

     Moreover, at the summary judgment stage the Ninth Circuit has held more aggressive

police conduct than that used by Officer Freeman to be objectively reasonable.  *See Tatum*, 441

F3d at 1096 (finding that positioning the plaintiff's arm behind his back in a bar arm control, placing him against a wall and then forcing him to the ground was not excessive force where he ignored the officer's commands and spun around partially escaping the officer's grasp, even though the plaintiff died from a cocaine overdose); *Jackson v. City of Bremerton*, 268 F3d 646, 652-53 (9th Cir 2001) (concluding that spraying the plaintiff's hair with a chemical irritant prior to her arrest, pushing her to the ground to handcuff her, and roughly pulling her to her feet during her arrest was not excessive force where she interfered with the officer's attempt to maintain order of a rowdy group). Here, there is no evidence that Officer Freeman continued to use any force on Hadley other than the brief control hold when removing Hadley from the train, or that the conduct complained of resulted in permanent injury.

Comparing the quantum of force used against the governmental interest at stake in light of Ninth Circuit precedent, the balance tips in favor of Officer Freeman. Accordingly, assuming that Officer Freeman issued a lawful order, this court finds that the amount of force he used to remove Hadley from the MAX train, while unfortunate and perhaps avoidable based on hindsight, is nonetheless objectively reasonable under the circumstances.

### b. Clearly Established Law

Even if the force used was excessive, Officer Freeman is entitled to qualified immunity because it would not have been clear to a reasonable officer that his conduct was unlawful in that situation. "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 US at 396.

Here, Officer Freeman did not strike a blow, force Hadley to the ground, use a restraint hold, a stun gun device, a beanbag gun, or lethal force to effectuate Hadley's arrest and remove him from the MAX train.  Instead, he controlled Hadley's arms and hands in order to apply handcuffs.  Hadley has cited no case, and the court is aware of none, in which such a measured use of physical force in response to a repeated refusal to cooperate with a lawful order has been found unreasonable.  Nor is the court aware of any binding authority requiring an officer to first ask a suspect if he would place himself in handcuffs rather than permit the officer to do it.  Moreover, even if the Fourth Amendment required a lesser quantum of force in this case (which is to say no force at all), the court finds that a reasonable officer would not have been on notice that this is what the law required.  Thus, assuming that Officer Freeman issued a lawful order to Hadley to exit the MAX train, he would be entitled to qualified immunity on the excessive force claim.  However, due to the factual issue concerning the lawfulness of the arrest, summary judgment on the excessive force claim should be denied.

## II.  Common Law Claims (Second Claim for Relief)

### A.  Proper Defendants

Hadley's Second Claim alleges that defendants are liable for the common law torts of negligence, assault and battery, false arrest and imprisonment, and negligent retention, supervision, and training.  Defendants move for summary judgment in their favor and also seek dismissal of Officer Freeman from all common law claims because he was acting within the scope and course of his employment.

Under the Oregon Tort Claims Act ("OTCA"), ORS 30.260-300, a plaintiff who sues over a municipal officer's tortious conduct must name the municipality, not the individual

officer, as the defendant.  ORS 30.265(1).  As long as an employee was acting within the course

and scope of his employment at the time the allegedly tortious conduct occurred, the only proper

claim is against the public body itself.  "For an act to fall within the scope of employment, it

must be of a kind which the employee was hired to perform, must have occurred within

authorized time and space, and the employee must have been motivated, at least in part, by a

purpose to serve [the employer]."  *Hasse v. Eugene*, 85 Or App 107, 110-111, 735 P2d 1258

(1987).  Hadley argues that the Oregon Supreme Court's decision in *Clarke v. OHSU*, 343 Or

581, 175 P3d 418 (2007), allows his common law claims against Officer Freeman in his

individual capacity to survive.  However, this court has previously held that the holding in

*Clarke* was limited and specific to the facts of that case.  *See Riordan v. City of Hermiston,*

*Oregon*, Civil No. 08-693, 2009 WL 1741377 at *6 (D Or June 15, 2009); *Johnson v. Hanada*,

Civil No. 06-1206, 2009 WL 73867 at *6-8 (D Or January 8, 2009).

     Here, Hadley asserts his state claims against both the City and Officer Freeman

individually.  He acknowledges that Officer Freeman acted within the course and scope of his

employment at all times.  Thus, the City is the only proper defendant in the state law claims, and

all state law claims against Officer Freeman should be dismissed.

     **B.  Negligence (Count I)**

     Where a plaintiff alleges both § 1983 claims and negligence claims, the court must

determine whether the conduct underlying those claims is identical.  The negligence claims can

survive only if they are premised upon facts distinct from those underlying the § 1983 claims:

> Following *Shilo* [*v. City of Portland*, 2005 WL 3157563 (D. Or
> November 22, 2005)], other courts in the District of Oregon have
> accepted that "a state common-law claim of negligence may be
> maintained separately from a § 1983 claim only when the

> negligence claim is based on facts that are different from the facts
> on which the § 1983 claims are based."

*Rodriguez v. City of Portland*, 2009 WL 3518004 *2 (D Or October 21, 2009), quoting *Whitfield*

*v. Tri-Metropolitan Transp. Dist.*, No. CV 06-1655, 2009 WL 839484 *11 (D Or March 30,

2009).

Hadley alleges that the City was negligent in several ways, namely by: (1) failing to give

him sufficient opportunity to locate his proof of fare before demanding he get off the train;

(2) grabbing his arm while he was searching for his fare receipt; (3) using excessive force while

grabbing his arm and forcing him to exit the train; and (4) kicking his legs when he was

attempting to comply with Officer Freeman's order that he spread his legs. These negligence

specifications are premised upon the same conduct that underlie Hadley's § 1983 claims.

Whether Hadley was given sufficient time to locate his proof of fare before being ordered to exit

the train is the same factual issue that underlies the claim that his arrest was unlawful; the

grabbing of his arm and the ensuing use of excessive force to remove him from the train were

both part and parcel of effectuating his arrest; and the kicking of his legs took place as part of the

search incident to his arrest.

Dismissal of a negligence claim which is premised upon facts closely related to those

underlying a § 1983 claim is inappropriate at the pleading stage. *Rodriguez*, 2009 WL 3518004

at *2. However, this case is well beyond the initial pleading stage and nothing in the record

indicates that Hadley's negligence claims turn on some independent conduct creating an

unreasonable foreseeable risk of harm to a protected interest of Hadley. Defendants addressed

their motion only at the third specification of negligence alleging excessive force. However,

because the record reveals no specification of negligence premised upon conduct independently

actionable as negligence, the City should be granted summary judgment against Count I of

Hadley's negligence claim.

## C.  Assault and Battery (Count II)

Under ORS 161.235, an officer is justified in using physical force upon another person

only when and to the extent that the officer reasonably believes it necessary "to make an arrest

. . . unless the peace officer knows that the arrest is unlawful."  Survival of the assault and

battery claim depends on the reasonableness of Officer Freeman's belief that the physical force

used on Hadley was necessary.  Thus, assuming the arrest was lawful, the assault and battery

claim fails for the same reasons as the excessive force claim discussed above.  However, if the

arrest was unlawful, then this claim survives.  Until the factual dispute concerning the lawfulness

of the arrest is resolved, summary judgment should be denied.

## D.  False Arrest / False Imprisonment (Count III)

The "gravaman" of a claim for false imprisonment is "the unlawful imposition of

restraint on another's freedom of movement."  *Hiber v. Creditors Collection Serv. of Lincoln

County, Inc.*, 154 Or App 408, 413, 961 P2d 898, *review denied*, 327 Or 621, 971 P2d 413

(1998), *quoting Buckel v. Nunn*, 133 Or App 399, 405, 891 P2d 16 (1995).  Its elements are "(1)

[the] defendant must confine [the] plaintiff; (2) [the] defendant must intend the act that causes

the confinement; (3) [the] plaintiff must be aware of the confinement; and (4) the confinement

must be unlawful."  *Id.*  To be liable, "the defendant 'must only intend to accomplish the act that

causes confinement; they need not intend the confinement to be unlawful.'"  *Carr v. City of

Hillsboro*, 497 F Supp2d 1197, 1211 (D Or 2007), *quoting Oviatt By and Through Waugh v.

Pearce*, 954 F2d 1470, 1479 (9th Cir 1992) (interpreting Oregon law).  Where the basis for an

unlawful imprisonment claim is an unlawful arrest, probable cause is a complete defense.  *Bacon v. City of Tigard*, 81 Or App 147, 149-50, 724 P2d 885, 886 (1986).

Thus, Hadley's state claim for false arrest or false imprisonment stands or falls with his Fourth Amendment claim.  If Officer Freeman had probable cause to arrest Hadley, then this claim fails.  Alternatively, if Officer Freeman did not have probable cause to arrest Hadley, then this claim survives.  Until the factual dispute concerning the lawfulness of the arrest is resolved, summary judgment should be denied.

### E.  Negligent Retention, Supervision, and Training (Count IV)

#### 1.  Legal Standard

To sustain a claim for negligent supervision under Oregon law, a plaintiff must establish that the employer had knowledge of an employee's dangerous propensities.  *See Whelan v. Albertson's, Inc.*, 129 Or App 501, 507, 879 P2d 888, 892 (1994); *Carr v U.S. West Direct Co.*, 98 Or App 30, 37, 779 P2d 154, 157-58, *review denied*, 308 Or 608, 784 P2d 1101 (1989).  They key issue is whether, in light of what the employer knew or should have known about the employee, the employer could reasonably foresee that the employee, if inadequately supervised, would engage in the kind of conduct that ultimately harmed the plaintiff.  *See M.N.O. v. Magana*, 2006 WL 559214 at *20 (D Or March 6, 2006), *citing Washa v. Dep't of Corrections*, 159 Or App 207, 225, 979 P2d 273, 283 (1999), *aff'd* 335 Or 403, 69 P3d 1232 (2003).  Foreseeability "generally presents an issue of fact, and, therefore, is not a likely candidate for summary judgment."  *Id*, *citing Cunningham v. Happy Palace, Inc.*, 157 Or App 334, 337, 970 P2d 669, 671 (1998), *review denied*, 328 Or 365, 987 P2d 510 (1999).

///

27 - FINDINGS AND RECOMMENDATION

2. **Evidence**

In support of this claim, Hadley offers the following evidence:

The Beaverton Police Department has a four-step training program for new officers known as recruits.  Lamberger Depo., p. 7.[6]  First, the recruit attends a seven-week in-house orientation academy with the City of Beaverton.  *Id*.  Next, the officer attends a 16-week police academy in Salem run by the Department of Public Safety Standards and Training.  *Id*.  The recruit then goes through the Field Training Evaluation Program ("FTEP") run by the Beaverton Police Department.  Beane Depo, p. 11.  The FTEP is a four-phase field training program, requiring a recruit to work closely with and be reviewed by a Field Training Officer ("FTO") for several weeks.  Lamberger Depo, p. 10.  Ideally, a recruit works with three different FTOs for the first three phases, returning to the original FTO for the final phase.  *Id* at 11.  After one year, the recruit is reviewed by a board of the Beaverton Police Department prior to going on solo patrol.  *Id* at 17.  If the board decides that the recruit is ready to be released from the training division and transferred to the patrol division, the recruit remains on probation for 18 months from the date of hire.  *Id* at 12.

Officer Freeman joined the Beaverton Police Department in November 2006.  Freeman Depo., p. 7.  He first attended orientation and the police academy, beginning the FTEP process in May 2007.  *Id* at 24.  As part of the FTEP process, a recruit's FTO fills out daily observation reports to track the recruit's behavior as they work with various sergeants and to facilitate

---

[6]  Both parties submitted portions of the Lamberger deposition.  Devlin Aff., Ex. E; Furnanz Decl., Ex. C.

performance discussions.  Roberts Depo., p. 27-28.[7]  During the FTEP process, several FTOs

wrote reports **[REDACTED TO PROTECT CONFIDENTIAL INFORMATION].**

On April 18, 2008, Officer Freeman was released from service **[REDACTED TO
PROTECT CONFIDENTIAL INFORMATION].**

Defendants object to some of this evidence as irrelevant and inadmissible hearsay.  First,

they object to evidence of Officer Freeman's conduct after the Hadley incident on January 18,

2008, namely **[REDACTED TO PROTECT CONFIDENTIAL INFORMATION]**  Evidence

concerning **[REDACTED TO PROTECT CONFIDENTIAL INFORMATION]** is clearly

inadmissible since only knowledge by the City before the Hadley incident is relevant.  However,

the February 4, 2008 meeting concerned Officer Freeman's performance over the past two

weeks.  Because this time period includes the Hadley incident, it is admissible.

Second, defendants object to Officer Freeman's alleged **[REDACTED TO PROTECT
CONFIDENTIAL INFORMATION]** just nine days prior to the incident with Hadley.  That

exchange put both Sgt. Schaer and Capt. Roberts on notice that Officer Freeman **[REDACTED
TO PROTECT CONFIDENTIAL INFORMATION]**.  Yet the City took no steps to correct

this performance deficiency.  Officer Freeman exhibited the same type of behavior when he

believed that Hadley was lying to him.  Therefore, it has some relevance and should be

considered.

Third, defendants object to the trial transcript concerning **[REDACTED TO PROTECT
CONFIDENTIAL INFORMATION]**.  While the **[REDACTED TO PROTECT
CONFIDENTIAL INFORMATION]** occurred during Officer Freeman's training period, the

---

[7]  Both parties submitted portions of the Roberts deposition.  Devlin Aff., Ex. G; Furnanz Decl., Ex. E.

record does not contain any information that the City was aware that Officer Freeman was

involved. Senior Training Officer Chris Lamberger testified that while he was aware of

**[REDACTED TO PROTECT CONFIDENTIAL INFORMATION]**, "it had nothing to do

with Officer Freeman." Lamberger Depo., p. 41. Although other officers discussed the incident,

there is no evidence that anyone prior to the trial knew the details involving Officer Freeman's

conduct. Beane Depo., pp. 92-93; Schaer Depo., pp. 47-48. Consequently, this document is

irrelevant, unfairly prejudicial, and inadmissible and will not be considered for purposes of the

current motion.

### 3. Analysis

The record contains insufficient admissible evidence to allow a reasonable jury to

conclude that the City could have reasonably foreseen that Officer Freeman would engage in the

type of misconduct alleged by Hadley. There is no evidence that the City was aware that Officer

Freeman had the propensity to act violently toward citizens or engage in otherwise dangerous

behavior. Even considering all of the evidence of Officer Freeman's **[REDACTED TO**

**PROTECT CONFIDENTIAL INFORMATION]** prior to the Hadley incident, there is no

evidence that the City knew that Officer Freeman ever used excessive physical force when

dealing with a citizen. Nor is there any information that the City had received any complaints

about his alleged propensity to use excessive force when interacting with citizens. Instead, the

record reflects that the City gave Officer Freeman extensive training and regularly documented

and evaluated Officer Freeman's performance during his training and probation period. None of

these records provide any support for Hadley's argument that the City knew that Officer

Freeman had the propensity to unlawfully arrest or act violently toward citizens.

In sum, there are no material facts that present a genuine issue for trial on this issue. Accordingly, summary judgment should be granted to the City on Count IV of the negligence claim alleging negligent retention, supervision, and training.

## RECOMMENDATION

For the reasons discussed above, Defendant's motion for summary judgment (docket #33) should be GRANTED as to:

1. The portion of the First Claim (§ 1983) alleging deprivation of the rights under the Fourteenth Amendment to bodily integrity and to be free from excessive force and the constitutional right to travel;

2. The Second Claim against defendant Christopher Freeman; and

3. Count I (Negligence) and Count IV (Negligent Retention, Supervision, and Training) of the Second Claim against defendant City of Beaverton.

and DENIED as to:

1. The portion of the First Claim (§ 1983) alleging deprivation of the rights under the Fourth Amendment to be free of unreasonable detention and arrest and unreasonable seizure; and

2. Count II (Assault and Battery) and Count III (False Arrest/False Imprisonment) of the Second Claim against defendant City of Beaverton.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due March 5, 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

31 - FINDINGS AND RECOMMENDATION

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 16th day of February, 2010.

s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge